T.C. Memo. 2007-173

UNITED STATES TAX COURT

TIMOTHY AND BARBARA KOSINSKI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9911-04.                    Filed July 2, 2007.

Neal Nusholtz and Richard M. Lustig, for petitioners.

Timothy S. Murphy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined a deficiency of
$1,205,548 and an addition to tax for fraud pursuant to section
6663 of $904,161 with respect to petitioners' Federal income tax
for 1997.  Unless otherwise indicated, all section references are
to the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are:

(1) Whether petitioners have unreported flowthrough income for 1997 resulting from overstated cost of goods sold on the Federal income tax return for petitioner Timothy Kosinski's solely owned S corporation;

(2) whether petitioners are liable for the fraud penalty pursuant to section 6663 for the year in issue, or, in the alternative, whether petitioners are liable for the accuracy-related penalty pursuant to section 6662;

(3) whether petitioner Barbara Kosinski is entitled to relief pursuant to section 6015 for 1997; and

(4) whether the statute of limitations bars assessment and collection of petitioners' income tax liabilities for 1997.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated into our findings by this reference. Petitioners are married and resided in Novi, Michigan, at the time that they filed their petition.

Petitioner Timothy Kosinski (petitioner) has been a licensed dentist since 1984 and was employed as an associate in a dental practice until 1991. In 1992, petitioner incorporated Timothy F. Kosinksi, P.C., his solely owned corporation, and was practicing dentistry under this name in 1997.

At the time of trial, petitioner Barbara Kosinski (Mrs. Kosinski) had been married to petitioner for 22 years. She received a bachelor's degree in psychology from the University of Michigan in Dearborn and was employed part time as a bank teller at two different banks consecutively during the 1980s. At the time of trial, Mrs. Kosinski was a full-time homemaker.

Petitioner's Contracting Business

After the death of his father in 1991, petitioner incorporated T.J. Construction Co. (T.J. Construction) to continue certain building projects on which his father had been working prior to his death. Petitioner's father had been a carpenter and independent contractor and had worked primarily with Thyssen Steel Inc. (Thyssen Steel), which manufactures steel wire, steel coil, and other steel products. From 1991 through 1999, Thyssen Steel was the only customer of T.J. Construction.

Much of the work performed by T.J. Construction was as a contractor for foundation cement work for two Thyssen Steel plants. Most of the work for the plant in Detroit, Michigan, was subcontracted out by T.J. Construction to Melvin Phillips (Phillips), the sole owner of Phillips Contracting Co. (Phillips Contracting), and Phillips was one of several subcontractors for the plant in Richburg, South Carolina. Phillips and petitioner were close family friends, and Phillips substantially facilitated petitioner's entrance into the contracting field. On the Thyssen

Steel projects, Phillips performed the work at the sites, and petitioner, through T.J. Construction, primarily handled the paperwork between Phillips and Thyssen Steel.

The Thyssen Steel projects involved numerous jobs for which individual proposals were submitted by Phillips to petitioner, who then forwarded the proposals to Thyssen Steel. Phillips included a 20-percent profit margin in his proposal for each job, and petitioner added a 10-percent administrative fee to the figure proposed by Phillips before submitting the final proposal to Al Paas (Paas), the project manager for Thyssen Steel, who then submitted the proposals for final approval by Thyssen Steel management. Petitioner typically requested payment from Paas for work completed, and payments were received from Thyssen Steel in checks made out to T.J. Construction. Petitioner then remitted to Phillips whatever petitioner determined was owed to Phillips, after deducting funds previously advanced to Phillips by petitioner.

On several occasions, envelopes containing $5,000 in $100 bills were given by petitioner to Paas, petitioner's contact for payment from Thyssen Steel. Paas was instrumental in T.J. Construction's receiving a performance bonus nearly double that which was required by the contract between Thyssen Steel and T.J. Construction. Petitioner did not require that Paas use the cash in a particular manner or keep receipts for the cash he

used, and petitioner kept no record of the cash he advanced to Paas.

Various methods of payment were used at various times by petitioner to pay Phillips or to advance money to Phillips. During the first couple of years that T.J. Construction was in business, it was petitioner's practice simply to write checks to cash from T.J. Construction's account to pay himself and Phillips. During their compilation at a later date, he would inform his accountants which of the checks that were written to cash went to Phillips and which ones went to petitioner. However, petitioner was advised by his accountants in late 1993 that checks written to cash would no longer be deducted and that petitioner would need documentation, such as checks to a specific payee, in order to claim a business deduction for those expenses.

Until mid-June 1996, petitioner paid Phillips and advanced funds on current projects by writing checks in the amount of $9,500 to Phillips from T.J. Construction's account, which checks Phillips cashed. Around that time, however, petitioner changed his practice and began to advance cash to Phillips as well as to write checks made out to Phillips from T.J. Construction's account, which checks were then endorsed by Phillips back to petitioner and deposited by petitioner into petitioners' personal bank account, allegedly as repayments for cash advanced. Petitioner did not inform his accountants that he was advancing

cash to Phillips in addition to writing the checks or that the checks were endorsed back to petitioner and deposited in petitioners' personal bank account. All of the checks that were endorsed back to petitioner were deducted as business expenses on T.J. Construction's Forms 1120S, U.S. Income Tax Return for an S Corporation.

The nature of the cash transactions between petitioner and Phillips was such that the actual amount of money paid to Phillips could be verified only by petitioner and Phillips. Petitioner kept track of the amounts owed to Phillips by T.J. Construction, but he destroyed those records regularly. Phillips did not keep records of the amounts he was owed, but rather relied on petitioner to handle the paperwork with regard to the Thyssen Steel projects.

From 1994 through 1998, Phillips paid his employees with a combination of checks and cash. He did not withhold any taxes and did not issue any Forms 1099 or Forms W-2, Wage and Tax Statement, with regard to payments to his employees. With the cash he received from petitioner, Phillips customarily made cash payments to temporary workers, to subcontractors, to regular employees as incentives and bonuses, and to suppliers.

In addition to substantial cash payments, petitioner made three large wire transfers to Phillips Contracting totaling $1,440,500 between 1996 and 1997. Petitioner treated these

amounts as cost of goods sold for the relevant years. However, petitioner also treated these amounts as cash advances or loans to Phillips, and he made out to Phillips from T.J. Construction's account, and had Phillips endorse back to him, checks equal to the total of the wire transfers, which checks petitioner then deposited into petitioners' personal bank account, even though petitioner had not advanced his own funds with regard to the wire transfers. Both the amounts transferred by wire transfer and the checks made payable to Phillips that were endorsed back to petitioner were treated as cost of goods sold during the preparation of petitioners' and T.J. Construction's tax returns, resulting in the full amounts of the wire transfers being so treated twice.

In late December 1998, Phillips needed a personal loan of $101,000. Petitioner advanced funds to Phillips out of his personal accounts, but he then had Phillips endorse checks out of T.J. Construction's account back to him, which checks were then deposited in petitioners' personal bank account. The checks made payable to Phillips and endorsed back to petitioner were then treated as cost of goods sold on T.J. Construction's return for 1998.

Petitioners regularly kept hundreds of thousands of dollars in cash in their home safe and safe-deposit boxes, as well as at petitioner's dentistry office.

Between 1995 and 1999, petitioners, Phillips, and Nina Spratt, an employee of petitioner's dental office, cashed checks and withdrew cash totaling $7,676,000 in $9,500 increments both from petitioners' personal account and from that of T.J. Construction. The $9,500 amount was just below the $10,000 threshold at which banks are required to report large transactions to the Federal Government, which resulted in these cash transactions' avoiding at least immediate scrutiny. In 1997, the year in issue, petitioner cashed or caused to be cashed checks totaling $1,976,000. In 1996 and 1998, petitioner cashed or caused to be cashed checks totaling $1,957,000 and $2,527,000, respectively.

Mrs. Kosinski regularly withdrew cash in $9,500 increments from petitioners' checking accounts at her husband's direction. Between 1995 and 1999, she cashed nearly 300 checks for her husband totaling approximately $2.85 million. In 1997 alone, Mrs. Kosinski cashed 87 checks, each for $9,500. On one occasion, she wrote a check to cash for $10,000 and left the check in an envelope under a doormat for Phillips to pick up.

Petitioner wrote 36 checks totaling $2,919,974 in 1997 to Phillips or Phillips Contracting that were endorsed back to petitioner and deposited into the personal bank account of petitioners. In 1996 and 1998, petitioner wrote checks totaling $2,079,253 and $3,144,398, respectively, that were endorsed back

to petitioner and deposited into the personal bank account of petitioners. All of the checks that were made payable to Phillips or to Phillips Contracting but endorsed back to petitioner were treated as cost of goods sold on the Forms 1120S of T.J. Construction for tax years 1996 through 1998.

From early 1996 through 1998, petitioner's brother, George Kosinski, performed substantial home improvements on petitioners' personal residence and on the home in which petitioner's mother lived, which home was owned by petitioners. The work performed by George Kosinski was billed by his company, Rougewood Construction, to "Tim Kosinski" but was paid for by checks out of T.J. Construction's account. Until December 1997, invoices from Rougewood Construction were addressed to petitioners' personal residence. Beginning in December 1997, the invoices were addressed to petitioner at his business address. All of the checks to Rougewood Construction, totaling nearly $141,000 from 1996 through 1998, were signed by petitioner, and none had any notation indicating that they were for personal expenses. Payments to Rougewood Construction for personal home improvement expenses of petitioners were deducted as business expenses on the Forms 1120S of T.J. Construction. Some of the personal home improvement work for petitioners was performed by Star Mechanical, a subcontractor of Rougewood Construction, and Star

Mechanical billed its expenses to T.J. Construction at the direction of George Kosinski.

Preparation of Petitioners' Federal Tax Returns

Susan Pereira (Pereira), an employee of Plotnik & Associates, was the certified public accountant (C.P.A.) who did the accounting for T.J. Construction and for petitioner's dental practice from 1991 through 1999.  She also prepared the Forms 1040, U.S. Individual Income Tax Return, for petitioners and the Forms 1120S for T.J. Construction during that period.  The returns prepared by Pereira were signed by Steven J. Plotnik, also a C.P.A.

For purposes of preparing the Forms 1040, petitioner generally provided Pereira with Forms W-2, yearend bank statements indicating any interest or dividend accounts, and copies of some relevant canceled checks and bills.  For purposes of preparing the Forms 1120S for T.J. Construction, petitioner generally provided Pereira with bank statements, check stubs, check stubs received from Thyssen Steel, and green sheets, which were petitioner's handwritten ledgers recording gross receipts and expenditures from T.J. Construction's account.  Pereira did not use the green sheets provided unless she had a question about something in her review of the bank statements and check registers during the course of her compilation and preparation of petitioners' and T.J. Construction's tax returns.

Pereira relied on deposits into T.J. Construction's bank account in determining the company's gross receipts and on T.J. Construction's check stubs, which were categorized by Pereira based on the information recorded on the check stubs, in determining cost of goods sold, operating expenses, and other deductible expenditures. All checks written to Phillips or to Phillips Contracting from T.J. Construction's bank account were included in the cost of goods sold listed on the Forms 1120S. Once the Forms 1120S were completed, the returns and a financial statement were hand delivered or mailed by Plotnik & Associates to petitioner, who was directed to sign and mail the returns. Petitioner never informed Pereira that he was advancing large amounts of cash to Phillips or that the checks made payable to Phillips were being endorsed back to petitioner and deposited into petitioners' personal account. She first became aware of the cash transactions and of the checks that were endorsed back to petitioner when the IRS initiated a criminal investigation of petitioners, as discussed below.

The green sheets that petitioner provided to Pereira included as business deductions of T.J. Construction estimated tax payments made on behalf of petitioner personally. On one occasion in 1995 or 1996, Pereira compared petitioner's figures on his green sheets with the figures she calculated and explained to him that tax payments made on behalf of petitioner personally,

when paid by T.J. Construction, were additional income to petitioner and not business expenses of the company.

Pereira had frequent discussions with petitioner regarding the books and records of T.J. Construction, but petitioner never disclosed to her that payments to Rougewood Construction and to Star Mechanical out of T.J. Construction's account were for his personal benefit or that they were related to personal home improvements. When Pereira sorted the check stubs that she was provided during her compilation for T.J. Construction, she categorized these payments under cost of goods sold as payments to subcontractors, because the names of the payees did not trigger any suspicion regarding whether the payments were business items, no notation was made on the check stubs that the payments were personal, petitioner's green sheets listed the payments as miscellaneous expenses of T.J. Construction, and Pereira was never informed otherwise by petitioner. In addition, T.J. Construction issued Forms 1099 to Rougewood Construction and to Star Mechanical for 1996 through 1998 for payments made to those entities to cover the personal expenses of petitioners.

Criminal Investigation and Conviction

During an initial interview with special agents of the Criminal Investigation Division of the Internal Revenue Service (IRS) on July 20, 1999, when asked why he and his wife had been consistently withdrawing large sums of cash from their accounts,

petitioner represented to the special agents that he was putting away money "in anticipation of the Y2K problem". Petitioner stated that he had $300,000 in cash in petitioners' personal safe at home and another $200,000 in cash in safe-deposit boxes. Upon review of the contents of the home safe, the special agents found 37 envelopes, each containing $5,000 in $100 bills, totaling $185,000. When asked why he withdrew cash in $9,500 increments, petitioner stated that he did it because that was the way his father used to make cash withdrawals and that he understood that a form must be filled out if cash transactions exceed $10,000. At the initial interview with the special agents, petitioner did not mention that he made regular cash payments to Phillips.

At petitioner's second interview 2 days later, the special agents' review of the contents of petitioners' safe-deposit boxes revealed 60 envelopes, each containing $5,000 in cash, totaling $300,000. When the special agents asked about the balance of the cash that petitioners had withdrawn over the last 3 years, which the special agents estimated at approximately $1.8 million, petitioner said that "he spent it". He did mention to the special agents at that time that Phillips, his main contractor, preferred to be paid in cash, and informed them that petitioner issued Forms 1099 to Phillips each year, but Phillips did not sign receipts for the cash payments he received from T.J. Construction.

On June 20, 2002, a grand jury returned a nine-count indictment against petitioner including:  (a) One count of conspiracy to defraud the IRS and to structure currency transactions to evade reporting requirements; (b) five counts of subscribing a false Federal tax return; and (c) three counts of structuring a currency transaction to evade reporting requirements.  The grand jury also returned a three-count indictment against Mrs. Kosinski, including one count of conspiracy and two counts of structuring currency transactions.  The Government alleged in the indictment that petitioners withdrew cash amounting to $7,666,500 for the purpose of concealing Phillips's payment of taxable wages in cash to his employees between 1995 and 1999.

A jury found petitioner guilty of seven counts (the conspiracy count, all of the false tax return counts, and one structuring count) and not guilty on two of the three structuring counts.  Petitioner was initially sentenced to imprisonment of two concurrent 30-month sentences and a 2-year and 1-year concurrent supervised release.  The case was appealed to the United States Court of Appeals for the Sixth Circuit, which remanded the case for resentencing.  Upon resentencing, petitioner was sentenced to 6 months in a halfway house, 6 months in home confinement, and 3 years of probation, in addition to being ordered to pay a $60,000 fine.  The United States Court of

Appeals for the Sixth Circuit has again remanded the case for resentencing. United States v. Kosinski, 480 F.3d 769 (6th Cir. 2007).

Mrs. Kosinski pleaded guilty to one count of structuring currency transactions and received probation, in addition to being ordered to pay a $5,000 fine and perform 100 hours of community service. When she pleaded guilty, Mrs. Kosinski testified under oath that no one had threatened her or her loved ones to induce her to plead guilty and no one had promised her favorable treatment if she pleaded guilty. She also explained her involvement in petitioner's currency structuring transactions:

> My husband and I agreed that I would go to the bank hundreds of times, almost always, and took money out in the amount of $9500. This is between 1996 and 1999. The account usually had a [sic] substantial more money in it than what I withdrew. The withdrawals were kept in an amount so that the bank would not have to fill out the federal reports for cash withdrawals over $10,000.

Phillips was indicted and pleaded guilty to conspiracy to defraud the United States and to tax evasion for the taxable year 1998 with respect to paying his employees in cash with no income tax withholdings, failing to issue Forms 1099 and Forms W-2, and failing to file his own income tax returns. He was sentenced to 21 months' incarceration and 2 years' supervised release, and he was ordered to file income tax returns for the taxable years 1996 through 1998.

OPINION

## Unreported Flowthrough Income

As a general rule, a taxpayer challenging the Commissioner's determinations in a notice of deficiency bears the burden of proof. Rule 142(a). That burden may shift to the Commissioner if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1). However, section 7491(a)(1) applies with respect to an issue only if the taxpayer has complied with the requirements under the Code to substantiate any item, has maintained all records required by the Code, and has cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B). Petitioners have not satisfied the conditions for shifting the burden of proof to respondent. In any event, the evidence establishes overstatement of cost of goods sold resulting in understated income and understated tax liability.

In calculating gross income, taxpayers may offset gross receipts by the cost of goods sold. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987); sec. 1.61-3(a), Income Tax Regs. In order to substantiate claimed cost of goods sold, taxpayers are expected to maintain adequate records. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

On the 1997 Form 1120S for petitioner's solely owned corporation, T.J. Construction, petitioners claimed cost of goods sold in the amount of $7,857,791.  All checks made payable to Phillips or to Phillips Contracting were treated as cost of goods sold, including $2,919,974 in checks that were issued to Phillips, endorsed back to petitioner, and then deposited in petitioners' personal bank account.  Respondent disallowed the costs of good sold for these checks.  Respondent concedes that petitioner made cash advances of $1 million to Phillips in 1997 and may treat $1 million of the checks that were endorsed back to petitioner as cost of goods sold.  Petitioners assert that their estimation of cash advanced to Phillips in 1997 is closer to $2.5 million.

Petitioners have presented no credible evidence that more than $1 million was advanced to Phillips.  In 1997, petitioner cashed or caused to be cashed checks totaling $1,976,000.  This amount is far less than the $2.5 million in cash that petitioners claim was advanced to Phillips that year.  Petitioner has presented no credible substantiating documentation regarding the amount of cash he claims to have advanced to Phillips.  Rather, he regularly destroyed the records he created to keep track of such cash advances and the balances owed Phillips.

Additionally, the record shows that petitioners' dealings in cash extended beyond his transactions with Phillips.  On several

occasions, petitioner gave cash to Paas, who was responsible for approving his bids and recommending him for bonuses from Thyssen Steel. Petitioners kept substantial cash hoards in their home safe and in safe-deposit boxes. Petitioner made a $101,000 personal loan to Phillips in December 1998, for which he then wrote checks made payable to Phillips out of T.J. Construction's account and had Phillips endorse them back to petitioner, who then deposited them in his personal accounts. Those checks were deducted as a business expense of T.J. Construction on its Form 1120S for that year.

One of the checks that was endorsed back to petitioner for $450,000 is related to a $450,000 wire transfer from T.J. Construction to Phillips. Petitioner's accountants treated as cost of goods sold both the wire transfer amount and the endorsed back check made payable to Phillips, which supposedly represented Phillips's indebtedness for receipt of the wired funds, and thus resulted in the $450,000 amount's being subtracted twice from gross receipts as cost of goods sold. Both the wire transfer and the matching endorsed back check occurred on October 3, 1997. Petitioners have conceded the $450,000 duplication of cost of good sold related to the wire transfer in 1997, and they have also conceded that additional wire transfers totaling $1 million were treated similarly in 1996, resulting in $1 million of costs

of good sold being subtracted from gross receipts twice in 1996. However, that year is not before the Court in this case.

Petitioners argue that the cash advances to Phillips and the endorsed back checks should be viewed as two independent liabilities stemming from separate and unrelated facts. Under such treatment, the cash advances from petitioner to Phillips would be viewed as personal loans, and the endorsed back checks would be viewed first as compensatory payments to Phillips and then as repayments to petitioner of the borrowed funds when the check was endorsed back to petitioner. Thus, because the endorsed back checks would be viewed as compensatory payments when issued from T.J. Construction, all of the endorsed back checks would be deductible business expenses of T.J. Construction, and the taxability to petitioner of the endorsed back checks would be dependent on how much cash was advanced as loans to Phillips. Petitioners argue that the tax treatment outlined above is required because it is undisputed that T.J. Construction owed Phillips money, and thus the checks issued to Phillips were payments of legitimate corporate obligations.

We are not persuaded by petitioners' retroactive portrayal of the transactions between Phillips and petitioners. It is not a necessary conclusion that all of the checks made payable to Phillips were payments of legitimate obligations of T.J. Construction. There is no credible evidence in the record

regarding the amounts that T.J. Construction owed to Phillips, and petitioner kept no reliable records to substantiate any liabilities or payments.

Because T.J. Construction is a flowthrough entity, petitioners claimed the benefit of the corporate deductions and costs of good sold taken for checks written to Phillips for which Phillips did not actually receive payment.  Due to the volume of the cash withdrawn by petitioners and the absence of any accurate records as to how much actually was given to Phillips, it is impossible to determine how much of the amount paid out in endorsed back checks represented payments received by Phillips.  However, respondent has conceded $1 million as an approximation of cash received by Phillips from petitioner, and thus $1 million of the endorsed back checks is allowable as cost of goods sold in 1997.

In an amended answer, respondent alleged that the cost of goods sold of T.J. Construction was overstated by an additional $21,253 because T.J. Construction paid for personal home improvement expenses of petitioner in that amount in 1997 for work performed by petitioner's brother and his brother's subcontractor.  Petitioners concede that these payments are personal, but they allege that they were not improperly treated under cost of goods sold for 1997 on the Form 1120S because petitioner allegedly had contributed funds to T.J. Construction

in prior years in order to cover the home improvement expenses. Although the capital contributions made by petitioner in prior years were not included in the income of T.J. Construction, petitioners argue that they should have been included and then the later deductions should be allowed.  In support of their argument, petitioners cite Lemler v. Commissioner, T.C. Memo. 1980-507, where this Court held that payments made to a corporation in reimbursement by the owner of the corporation should be included in the corporation's income.  Because we are not persuaded by the evidence petitioners have presented in support of their allegation that prior contributions were made to T.J. Construction as reimbursements in advance, we need not reach the question of whether such reimbursements should be included in the corporation's income.  We hold that the disbursements from T.J. Construction to pay for improvements on the personal home of petitioners and on the home occupied by petitioner's mother are not cost of goods sold and create additional flowthrough income to petitioners in 1997.

Fraud Penalty

The penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Sadler v.

Commissioner, 113 T.C. 99, 102 (1999).  Respondent has the burden of proving, by clear and convincing evidence, an underpayment for the year in issue and that some part of the underpayment for that year is due to fraud.  Sec. 7454(a); Rule 142(b).  If respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent penalty, unless the taxpayer establishes that some part of the underpayment is not attributable to fraud.  Sec. 6663(b).  Respondent must show that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes.  Katz v. Commissioner, 90 T.C. 1130, 1143 (1988).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992).  Fraud will never be presumed.  Id.; Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Fraud may, however, be proved by circumstantial evidence and inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available.  Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).  Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including the consistent

understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealing assets, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Dealing in cash is also considered a "badge of fraud" by the courts because it is indicative of a taxpayer's attempt to avoid scrutiny of his finances. See id. at 308. Whether a taxpayer has consistently underreported income over an extended period of time is also a relevant factor in analyzing whether the taxpayer had a fraudulent intent in understating his tax liability. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603.

Respondent's burden regarding the underpayment of tax in support of the fraud penalty has been met. Petitioners have conceded more than $450,000 in overstatements of cost of goods sold, and we have found clear and convincing evidence, for the reasons set forth above, that approximately $1.5 million more was overstated by petitioners in 1997. Those overstatements resulted in substantial understatements of petitioners' tax liability for that year.

The evidence in this case also establishes the existence of several "badges of fraud" in petitioners' financial dealings. Petitioners understated their income in 1997 by approximately $2 million, and the record shows that they understated their

income by similarly substantial amounts in at least 1996 and 1998, the years immediately before and after the year in issue. Petitioner kept some detailed records regarding expenses, but regularly destroyed those that recorded his cash disbursements to Phillips. Petitioner did not inform his accountants about the substantial cash withdrawals and payments to Phillips, and the records he provided to his accountants did not disclose such cash transactions on their face. He adopted this course after being advised by his accountants that checks to cash would not be deducted on returns prepared by the accountants.

There are multiple inconsistencies and implausible explanations of behavior in the testimony of both petitioners. For instance, petitioner testified at one point that his profit margin was from work performed by subcontractors other than Phillips. At another time, he admitted that Phillips was his primary contractor and represented the majority of his cost of goods sold expenditures. When asked at his first meeting with special agents from the IRS about why he kept hundreds of thousands of dollars in cash on hand, petitioner claimed that he was accumulating cash "in anticipation of the Y2K problem", never mentioning his cash dealings with Phillips. At his second interview with them, when asked what happened to the additional $1.8 million in cash petitioners had withdrawn over the preceding

3 years, petitioner told the special agents that he had spent the cash and mentioned Phillips for the first time.

Mrs. Kosinski, who had worked previously as a teller at two different banks, admitted to withdrawing personally nearly $3 million in $9,500 cash increments on behalf of her husband from 1995 through 1999, nearly $1 million of which was withdrawn in 1997 alone. Although she testified in her criminal proceeding that she made hundreds of $9,500 withdrawals so that the bank would not have to fill out Federal reports for cash transactions over $10,000, Mrs. Kosinski testified in this case that she did not know and never inquired about her husband's purpose in withdrawing the cash, why the money was withdrawn in $9,500 increments, or what her husband did with the money once she gave it to him. Mrs. Kosinski also testified that she did not know that her husband was making substantial cash payments to Phillips; yet she also testified that on one occasion she left a $10,000 check payable to cash under a doormat for Phillips at her husband's direction. Not only did petitioners both participate in structuring substantial cash transactions, they both gave inconsistent and implausible testimony regarding that issue.

Evidence of fraud in this case also includes the substantial number of structured cash transactions outlined above in which petitioners regularly engaged over several years. Petitioners purposefully made withdrawals just below the threshold at which

financial institutions are required to report to the Government and documented (or failed to document) their use of the cash in such a way that not even petitioner could verify where the money went.

Petitioners had on hand nearly half a million dollars in cash in their personal safe at home and in their safety deposit boxes when criminal investigators from the IRS first interviewed them. Petitioner's statements to the criminal investigators at his first meeting with them regarding his purpose in hoarding cash differed from those statements made at his second meeting with them.

Although petitioner's conviction for subscribing false Federal tax returns does not collaterally estop him from denying that he fraudulently understated petitioners' income tax liability, his conviction is evidence of fraudulent intent. See Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

Petitioners assert that any inaccuracies in their reported tax liabilities for the relevant years are attributable primarily to miscommunication between them and their return preparers and accountants, Susan Pereira and Steven J. Plotnik. Petitioners claim that their accountants should have caught several of the checks that were for personal expenses by looking at records, some of which were made available to the accountants, outside of the bank statements and check stubs of T.J. Construction.

However, petitioners' accountants were hired by petitioners to perform only a compilation of their accounts and prepare their tax returns. The evidence does not show that the accountants could have discerned the nature of the extensive cash dealings by petitioners if the additional documents had been reviewed. Although petitioner's accountants had warned him that checks must be made payable to the actual recipients of the money, petitioner never informed them of his cash transactions, which were obviously designed to circumvent their advice to him. The first time the accountants were made aware of any cash dealings was when approached by IRS agents investigating petitioners for criminal tax violations.

A taxpayer is not entitled to shift responsibility for inaccurate returns onto his return preparer where the preparer is not provided with complete and accurate information regarding the taxpayer's income and expenses. See Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. The responsibility of filing accurate returns remains principally with the taxpayer, especially where the taxpayer has taken an active and controlling role regarding the information that is used for the preparation of the returns. See Medlin v. Commissioner, T.C. Memo. 2003-224, affd. 138 Fed. Appx. 298 (11th Cir. 2005). Petitioners cannot

blame their return preparers for the substantial errors in reporting their tax liability for 1997 when petitioner, who alone possessed the information that would have indicated potential discrepancies between petitioners' actual tax liabilities and the amounts reported on their returns, provided the accountants with misleading information and documentation regarding the nature of disbursements out of T.J. Construction. See Bacon v. Commissioner, T.C. Memo. 2000-257, affd. without published opinion 275 F.3d 33 (3d Cir. 2001). Furthermore, petitioner's failure to inform the accountants, despite regular meetings with them, of the existence of the cash advances from petitioner to Phillips or that Phillips was endorsing checks received from T.J. Construction back to petitioner, who was then depositing those funds in petitioners' personal bank account, is indicative of fraud. See Medlin v. Commissioner, supra; Ishler v. Commissioner, T.C. Memo. 2002-79.

Petitioners cite McGowan v. Commissioner, T.C. Memo. 2004-146, affd. 187 Fed. Appx. 915 (11th Cir. 2006), in support of their contention that the errors on petitioner's tax returns are due to confusion between petitioner and his accountants, and not fraudulent intent. We have found, for the reasons stated above, that the errors were deliberately designed by petitioner and were coupled with several other indications of fraudulent intent.

As outlined above, the evidence indicates the fraudulent intent of both petitioner and Mrs. Kosinski with regard to the overstatement of cost of goods sold and understatement of their taxable income for 1997.  Petitioners have not proven that any part of the underpayments was not attributable to fraud.  See sec. 6663(b).  On consideration of the entire record, we conclude that petitioners are liable for the fraud penalty determined under section 6663(a).

Section 6015 Relief

Generally, married taxpayers may elect to file a joint Federal income tax return.  Sec. 6013(a).  After making the election, each spouse is fully responsible for the accuracy of the return and jointly and severally liable for the entire tax due for that year.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000).  A spouse (requesting spouse) may, however, seek relief from joint and several liability by following procedures established in section 6015.  Sec. 6015(a).  A requesting spouse may seek relief from liability under section 6015(b) or, if eligible, may allocate liability according to provisions under section 6015(c).  Sec. 6015(a).  If relief is not available under section 6015(b) or (c), an individual may seek equitable relief under section 6015(f).  Section 6015(f) permits relief from joint and several liability where "it is

inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)".

Mrs. Kosinski seeks relief under section 6015(b) for 1997. Section 6015(b) provides, in pertinent part, as follows:

> SEC. 6015(b).  Procedures For Relief From Liability Applicable to All Joint Filers.--
>
>> (1) In general.--Under procedures prescribed by the Secretary, if--
>>
>>> (A) a joint return has been made for a taxable year;
>>>
>>> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>>>
>>> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>>>
>>> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>>
>> \*       \*       \*       \*       \*       \*       \*
>>
>>> then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive.  Accordingly, a failure to meet any one of them prevents a requesting spouse from qualifying for the relief

offered therein. <u>Alt v. Commissioner</u>, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

Respondent argues that Mrs. Kosinski has failed to meet the requirements of subparagraphs (C) and (D) of section 6015(b)(1). Petitioners argue that Mrs. Kosinski meets the requirements of section 6015(b)(1)(C) because she had no actual knowledge of improper deductions taken on petitioners' tax return and because she did not benefit from the improper deductions "because of the volume of income on the tax return." Petitioners urge the Court to consider "how a reasonable person would react to a 1997 tax return where $1,392,874.00 of taxable income is reported and $521,305.00 of tax is paid, knowing that her spouse had withdrawn large amounts of cash from the bank." We understand petitioners' argument to be that Mrs. Kosinski was not capable of understanding that excessive costs of good sold and deductions were improperly claimed on their tax return for 1997 because there was too much money involved overall for her to notice the discrepancy. Given Mrs. Kosinski's education and employment history, as well as her substantial and active role in the cash structuring transactions, we are not persuaded by this argument.

Petitioners also argue that Mrs. Kosinski was unaware of any necessary increase in petitioners' income due to the $21,252 of expenses related to improvements to petitioners' home that was paid out of T.J. Construction's account and deducted as business

expenses. Petitioners make no argument with regard to section 6015(b)(1)(D) that it would be inequitable to hold Mrs. Kosinski liable for the deficiencies in tax stated on petitioners' 1997 joint return.

Mrs. Kosinski is a college graduate and has previous work experience as a bank teller for two different banks. From 1995 through 1999, she cashed approximately $2.85 million in checks, all in $9,500 increments, from petitioners' personal and business accounts. She cashed 87 checks totaling over $800,000 during 1997. Mrs. Kosinski testified that she did not know her husband's purpose for the cash withdrawn or what he did with it once she gave it to him. On one occasion, at her husband's direction, she wrote a check to cash in the amount of $10,000 and left the check in an envelope under a doormat for Phillips. She testified that she never asked her husband why they were withdrawing millions of dollars of cash in $9,500 increments from their bank accounts.

Mrs. Kosinski testified that she did not know that checks from T.J. Construction's bank account rather than from petitioners' personal account were written to pay for approximately $141,000 of improvements on petitioners' home and the home of petitioner's mother between 1996 and 1998. Mrs. Kosinski was aware of the extensive improvements being made to her home, and the majority of the invoices from Rougewood

Construction in 1997 for the home improvements were addressed to petitioners' personal residence. Petitioners shared a joint checking account for personal finances, Mrs. Kosinski's name was on the account, and she wrote checks on that account. Even if her husband was responsible for balancing their joint checking account, as Mrs. Kosinski testified, it is implausible that Mrs. Kosinski was not aware that the expenses for improvements to petitioners' home were paid out of T.J. Construction's bank account and not from petitioners' personal account.

We do not believe Mrs. Kosinski's implausible testimony and conclude that she was an active participant in a fraudulent scheme to understate petitioners' income and tax liability. She has not met the requirement of section 6015(b)(1)(C), nor has she established, pursuant to section 6015(b)(1)(D), that it would be inequitable to hold her liable for the deficiency in petitioners' tax for 1997.

Statute of Limitations

As a general rule, section 6501 provides that any tax must be assessed within 3 years of the date on which the pertinent tax return was filed. Sec. 6501(a). However, an exception exists in the case of a "false or fraudulent return", under which exception tax may be assessed at any time. Sec. 6501(c)(1). Respondent bears the burden of proving fraud in this context. Sec. 7454(a); Rule 142(b). Because respondent has done so here for the reasons

explained above, assessment of petitioners' 1997 tax liability is not barred by the statute of limitations.

We have considered the arguments of the parties that were not specifically addressed in this opinion.  Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.